IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | DOCKET NO. A-06-CR-190(01)SS |
| | § | |
| JEREMY WATNICK | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT JEREMY WATNICK'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE FROM SENTENCING GUIDELINES

DEFENDANT JEREMY WATNICK, by and through his attorney of record, files this Sentencing Memorandum and moves the Court to grant his request for a downward departure when determining the guideline range of his sentence and for grounds would respectfully show the Court the following:

### I. Introduction

Defendant JEREMY WATNICK files this Sentencing Memorandum and Motion for Downward Departure pursuant to U.S.S.G. §5K2.0 to assist the Court in deciding the appropriate sentence in this matter, in the event that the Court finds that Defendant Watnick becomes entitled to the benefits of the "safety valve", U.S.S.G. §5C1.2, otherwise entitled to a reduction from the statutory minimum in this case. The downward departure Motion is based on a combination or convergence of factors that takes this case outside the heartland of cases and defendants considered by the Sentencing Commission in adopting the Sentencing Guidelines.

1

While the general authority to depart and the bases for these requests are outlined below, Defendant wishes to emphasize that what he is asking for by way of departure motions are the epitome of "guided departures," through which a sentencing court departs downward in cases where factually and legally appropriate, and it does so in a fashion consistent with the principles behind the Sentencing Guidelines, having due regard for the fact that the Sentencing Guidelines are now advisory only United States v. Booker, 125 S.Ct. 738 (2005).

The factual representations made in this Sentencing Memorandum are based upon the Presentence Investigation Report ("PSR"), notes from the Presentence Investigation Interview, e-mails from Kevin Wenk, pleadings in this case and conversations with Mr. Watnick.

### II. Factual Background

Mr. Watnick pleaded guilty on October 26, 2006 to Count 1 of the Indictment, Possession of Firearm by Felon in violation of 18 U.S.C. § 922(g)(1). The PSR found a Total Offense Level of 17, beginning with a Base Offense Level of 20, decreased by three levels for Acceptance of Responsibility. The total criminal history points for Mr. Watnick is 6, putting him in Criminal History Category III. Defendant filed no objection to the Presentence report.

### III. Departures Under the Guidelines and After

18 U.S.C. Section 3553 governs the application of the Guidelines in imposing sentence and provides, in relevant part, as follows:

**(a) Factors to be considered in imposing a sentence.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the

purposes set forth in paragraph (2) of this subsection of the court in determining the particular sentence imposed shall consider-

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and

(3)   the kinds of sentences available;

(4)   the kinds of sentences and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(a)( 1) of title 28, United States Code, and that are in effect on the date the defendant is sentenced; or

(5)   any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

(6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

The sentencing guidelines allow a court to depart downward from the guideline range if the court finds an aggravating or mitigating circumstance which was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and which should result in a sentence different than that described. In determining whether a circumstance was adequately taken into consideration by the Commission, the sentencing judge shall consider the sentencing guidelines, as well as policy statements and official commentary of the Sentencing Commission. Koon v. United States, 518 U.S. 81

(1996). The factors warranting a departure in a particular case do not exist in isolation, but may well converge to create the unusual situation not contemplated by the Commission. U.S.S.G. §5K2.0 provides that ("[t]he decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis").

Section 3553(a) sets forth various factors – one of which is the guidelines – that must be considered in determining a sentence. The sentencing mandate contained in that section requires district courts to impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in Section 3553(a)(2): retribution, deterrence, incapacitation, and rehabilitation.

After United States v. Booker, 125 S.Ct. 738 (2005), even when no "traditional departure" is available or granted, the district court may still sentence outside the applicable guidelines range in exercising its discretion under Section 3553 – without the need to justify the sentence under a "departure" or "heartland" methodology.

### IV. Motion for Downward Departure: A combination of Factors Take Mr. Watnick's Case Out of the Heartland of Cases and Defendants Considered by the Sentencing Commission in Adopting the Guidelines.

Defendant respectfully requests the Court to depart downward one or two levels based upon a convergence or combination of factors that take this case out of the "heartland" of cases and defendants considered by the Sentencing Commission in adopting the Guidelines. Such a departure is justified both under traditional departure guidelines as they existed prior to Booker and after Booker,

4

based on the Court exercising its discretion under Section 3553, without the need to justify the sentence under a "departure" or "heartland" methodology.

The Guidelines place essentially no limit on the number of potential factors that may warrant departure. The Sentencing Commission set forth factors courts may not consider under any circumstances (although after Booker this too is advisory only) but made clear that with those exceptions, it "does not intend to limit the kinds of factors (whether or not mentioned anywhere else in the guidelines) that could constitute grounds for departures in an unusual case." 2004 U.S.S.G. Ch. I, pt. A, Introduction, 4(b). In addition, 18 U.S.C. §3661 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added). This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, employment record, drug or alcohol dependence, lack of guidance as a youth, and family ties and responsibilities. See U.S.S.G. §5H1.

The Sentencing Commission intends the sentencing court to treat each guideline as carving out a "heartland", a set of typical cases embodying the conduct that each guideline describes. "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure

is warranted." 2004 U.S.S.G. ch. I, pt. A, Introduction, 4(b). Both 18 USC §3553 and United States v. Koon , supra,  give a district court the authority to depart where a particular case presents atypical mitigating features that were not adequately taken into consideration by the Sentencing Commission and Booker allows a court to justify a sentence outside the calculated guideline range by factors that would not have previously permitted a departure from the guideline range. This is such a case.

### Nature and circumstances of the offense.

Mr. Watnick pled guilty to possession of two firearms. Those guns were purchased by Janice Wenk, his co-Defendant and lover, following a series of threats against Mr. Watnick by Kevin Wenk, Ms. Wenk's estranged husband and Mr. Watnick's former friend. Mr. Wenk's crusade against Mr. Watnick started in approximately June of 2004 when Mr. Wenk broke into Mr. Watnick's home in Puerto Rico and tried to stab him with a knife.  Mr. Watnick fled Puerto Rico accompanied by Ms. Wenk and her two young children and returned to the United States.

Even though Mr. Watnick had moved thousands of miles away, Mr. Wenk continued his harassment, repeatedly threatening to kill or maim the "bagel", "Hebrew dick" or "jew boy", as he malevolently referred to Mr. Watnick in his frequent communications. Fearing that her husband's unbridled animosity toward Mr. Watnick would place her two young children in jeopardy, Ms. Wenk decided to purchase the two guns to protect her family.

The guns were purchased solely for self defense and protection against an irrational and dangerous individual.  Mr. Watnick never displayed those guns in a dangerous, offensive or threatening manner. He never fired or pointed the guns at any person or routinely carried them in his vehicle. Mr. Watnick only used the guns to target practice at a licensed shooting range. He visited the range once with Ms. Wenk and subsequently by himself. This is the first offense committed by Mr. Watnick that involved weapons.

History and Characteristics of the Defendant.

The Court is generally prohibited from entertaining a collateral attack on the predicate offense, Daniels v United States   532 U.S. 374 (2001). However, an examination of the circumstances related to Defendant's state conviction is helpful in understanding the chemical dependent history of the Defendant.

Mr. Watnick was convicted in California in September of 2005 of the felony offense of Burglary of an Inhabited Residence. That conviction caused Mr. Watnick two significant, unanticipated consequences.  First, when Mr. Watnick possessed the two licensed firearms in 2006, an act that is legal for most persons, he committed a serious federal offense with likely prison implications. Secondly, because burglary of a dwelling is lumped with arson, extortion, use of explosives and use or threatened use of physical force as a crime of violence, §4B1.2(a)(2) the base level of 12, which is applicable for most §2k2.1 possession of firearm offenses, jumped to a level 20. See U.S. v Murillo-Lopez 444 F.3d 337 (5th Cir. 2006) holding that a conviction for burglary of a habitation pursuant to

Penal Code §459 (the same statute under which Watnick was convicted) constitutes a crime of violence permitting a § 2L1.2 USSG enhancement.

Mr. Watnick's burglary involved no act of force or violence. It was a desperate act committed by a person burdened with a serious drug dependency. Without permission, Mr. Watnick entered the master bathroom of Janice Wenk's parents and stole prescription medication from Ms. Wenk's father. Ms. Jean Warren, Ms. Wenk's mother, has submitted a letter which is attached hereto which explains the non-violent, drug-related character of Mr. Watnick's offense.

During his time with Ms. Wenk, Mr. Watnick has generously provided support and affection to her two young children. A letter from his sister and another from his father describe that loving relationship. Friends of the family who have known Mr. Watnick's for many years also wrote letters of support, which are attached.

To Provide the Defendant with Needed Medical Care or Other Correctional Treatment in the Most Effective Manner.

Mr. Watnick's California conviction resulted from his drug addiction, which existed before he moved to California and continued while he lived in Texas. Mr. Watnick readily acknowledges that he needs intensive drug treatment. The Residential Drug Abuse Program (RDAP) mandates the Bureau of Prisons to provide substance abuse treatment for each prisoner who has a treatable substance abuse or addiction condition. 18 U.S.C. § 3621(b) Mr. Watnick has expressed his desire to participate in that program.

18 U.S.C. § 3621(e)(2)(B) permits the Bureau to reduce up to one year incarceration time of a prisoner who has successfully completed the treatment program. But, that early release provision is unavailable for persons who have been convicted of a violent offense. 18 U.S.C. § 3621(e)(2)(B)(1) The Bureau has interpreted "violent offense" to include "an offense that involved the carrying, possession, or use of a firearm or other dangerous weapon or explosives, (including any explosive material or explosive device.) 28 CFR Sec. 550.58 (5)(ii). Therefore, despite never having used weapons in an offensive or violent manner, Mr. Watnick will not receive early release credit for his participation in the treatment program.

For all the foregoing reasons, Mr. Watnick respectfully respects a reduction of one or two levels and a sentencing at the lowest end of that level. Such a sentence would reflect the seriousness of the offense, promote respect for the law, provide a just punishment, deter future conduct, and protect the public while at the same time showing mercy to a defendant deserving of mercy.

WHEREFORE, PREMISES CONSIDERED, Defendant Jeremy Watnick respectfully requests that the Court grant the downward departure set forth herein.

Respectfully Submitted,

GREENSTEIN & KOLKER
1006 East First Street
Austin, Texas  78702
(512) 472-6270
(512) 472-8263 (FAX)

by:  MALCOLM GREENSTEIN
STATE BAR ID #08403300

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Defendant's Sentencing Memorandum and Motion for Downward Departure from Sentencing Guidelines was served by electronic delivery upon Douglas Gardner Assistant U.S. Attorney, U.S. Department of Justice, 816 Congress Ave., Suite 1000, Austin, Texas, 78701 on the 28th day of December, 28, 2006.

MALCOLM GREENSTEIN

November 14, 2006


To whom it may concern:


In regards to the incidents in which prescription drugs were stolen from our home in Los Gatos, California, September 2004, please refer to our letter on file in the District Attorney's office of the County of Santa Clara, California and other court documents explaining the details of the theft. The purpose of this letter is to restate the manner in which the theft took place.

The crime Jeremy Watnick committed was not violent in nature. He had been allowed as a guest in our home and had used all the upstairs bathrooms on occasion. He did not have permission, however, to take our personal prescription medicine from our master bathroom.


Jean Warren
P.O. Box 696
Bodega Bay, CA 94923
707-875-9240

**Jay S. Watnick**
Attorney-at-law
Sixty East End Avenue
New York, New York 10028
————
Tel. 212.517.6757
Fax 212.249.3487

The Honorable Sam Sparks
United States District Judge for the
Western District of Texas

12.18.06

Dear Judge Sparks,

    My name is Jay Watnick. I am Jeremy's father. I am 71 years old, admitted to the New York State Bar and The United States Supreme Court.

    My wife and I adopted Jeremy to be our son when he was just fours days old and have given him the best education together with much love and support. Support because, unfortunately Jeremy was born with a vexing, frustrating, distracting and confusing condition, less known then, but now known as ADD. ADD is a condition resulting from a chemical imbalance in the brain that results in great difficulty in concentrating and even more vexing, highly difficult to avoid excessive impulsivity.

    Jeremy was as young as five when his condition was diagnosed and Ritalin was prescribed. Jeremy has needed to take his Ritalin once or twice a day ever since. It certainly is not a prefect remedy, but does result in temporary relief. Unfortunately, it is a controlled substance difficult and very expensive to obtain.

    In 2001, Jeremy was employed in the New York office of a California internet company. As a result of deteriorating business conditions in New York City, following the 9/11disaster, made worse by a recession. A former "friend" Kevin Wenk had been pestering Jeremy and me, urging Jeremy to relocate to Puerto Rico where he claimed he had a business or Jeremy could find employment. It turned out instead that Kevin lied about having a business and job opportunities were scarce. Kevin apparently had been in Puerto Rico for several years and told Jeremy he now had a wife, Janice and a 5 year old son and an infant daughter. Because job prospects in New York were dismal, I urged Jeremy to give Puerto Rico a go.

    Jeremy went to Puerto Rico and found Kevin and Janice living in a small coastal resort village far from San Juan or any city or airport. They had one vehicle repeatedly breaking down. Jeremy described that the living conditions were basic and a hardship on Janice and the children. Yet, Jeremy did not know what lay ahead. After a couple of weeks, Jeremy phoned and said, "Dad, I need to get out of here. This place is filled with drugs and people who use them openly." I told Jeremy that I thought he must be exaggerating. How could Kevin live in a place like that with a wife and two children?

    Jeremy phoned again and said Kevin was abusing Janice. He said that Janice had told him that she had been trying to get away with her children, but no one would help. It was Jeremy who provided the support and means to get Janice and the children away. First he sent Janice and the children to her parents in Los Gatos, California. And then Janice joined Jeremy in New York where Jeremy had a car. Jeremy immediately set out driving cross country, bringing Janice to meet up with her children and Janice's parents.

    Upon arrival, Jeremy was met by an ice cold and insulting reception by Janice's father. Although, he had a four bedroom house just for his wife and himself, he told Jeremy in a sharp

and rough manner that Jeremy had to sleep in a tent outside on the ground.
It seems that Janice's father had his head filled with slanderous and debasing accusations from Kevin that Jeremy was a drug addict and a vile person.

Jeremy was granted full access to her parent's house, including the bathroom. Her father's pills were apparently taken and the sheriff was called in.
In the meantime Jeremy, ever concerned about his assumed responsibility for supporting Janice and the children, searched for and found a home and a perfect job in his field near Janice's parents in Santa Cruz.

During the period Jeremy was employed, his employer announced that they were moving the firm to Austin, Texas and Jeremy would need to relocate and would be getting a promotion. In the meantime, I'm told, Janice's father kept after the sheriff, and then the prosecutor to move against Jeremy.

Although, this event should have been resolved with an apology over the kitchen table, or at worst (in New York, a simple desk appearance or a fourth degree misdemeanor), the prosecutor persisted in pursuing it as a felony.

Jeremy, mindful of his assumed responsibility to support the family and needing to relocate with his employer to Texas, simply pleaded guilty on the basis that the judge hearing the case might not impose jail time which would have left Janice and the children homeless and impoverished.  The judge accepted Jeremy's plea, which allowed him to relocate to Texas, keep his job, and serve probation there on certain conditions.
Unfortunately, it seems the conditions about a gun was not kept, even though it was only used at a legal, licensed, safe firing range.  Jeremy had never been accused of having or using a gun.

I'm told this arose out of Janice's and Jeremy's fear that Kevin's threats (Janice's estranged husband) to get Jeremy, might be carried out. I'm told that Kevin either tried or threatened to kill Jeremy in Puerto Rico and was arrested and incarcerated by the police.

It was bad judgment and impulsive on Jeremy's part. Impulsiveness is that impelling force undermining and plaguing a normal life for Jeremy.

Jeremy, still recognizing his obligation to support Janice and the children, accepted a plea in your court. Accordingly, I pray that your honor finds it in his heart to impose probation or a minimum sentence, so Jeremy can support Janice and her children, keep them off of welfare, and prevent them from being evicted.

The children's grandparents have stated categorically that they will not provide any support for food rent or utilities. Janice has no money for childcare or a babysitter to go out and look for work. In addition, she is unable to find a job because she has a felony conviction and no one will hire her in the filed she has been trained in. Then children's father, Kevin Wenk, has not provided any child support.

As a parent and colleague, I pray you will show mercy and compassion. Jeremy will still continue to bear the burden of this felony on his shoulders for the rest of his life. May Jeremy go forward out of this tragedy as a remorseful and responsible tax paying parent, husband and citizen, and make positive use out of his God-given good qualities.

Sincerely,

Jay S. Watnick

Dariele Watnick                                           December 12, 2006
360 East 72nd Street, B-800
New York, New York 10021

Dear Honorable Sam Sparks,
United States District Judge
Western District of Texas
Austin Division

My name is Dariele Watnick and I'm a certified teacher of the State of New York. The past ten years has given me the opportunity to work with students on many developmental, socioeconomic, intellectual, and biologically challenged levels. Many of the children that I have worked with have some type of disorder. Over my years of teaching, it is clear that students who have the support and concern of their families have acclimated and succeeded more than those who unfortunately do not have a support system. Jeremy has a support system; from his immediate family (his parents and sister) to the family he has adopted as his own (Janice and the children, Abbey and Spencer).

My brother is three and a half years older than me. He came with my parents to the hospital to bring me home the day of my adoption (three days old) and has never let go. And in return, I cannot let go either.

Jeremy has Attention Deficit Disorder. This is a disorder and label my brother has worn since he was six years old. It sounds manageable when his disorder is called ADD and medication like Ritalin is prescribed. It is human nature to overlook details regarding a particular disorder when it does not affect an individual or a family on a daily basis.

There is a great deal of literature now available regarding this disorder and most of it reads like a chapter in a psychology textbook. Descriptions like, ".people with ADD tend to feel anxious, have difficulty concentrating, are highly impetuous and are easily distracted." This certainly raises concern; however, no amount of medical description can convey the experience, frustration and difficulty Jeremy has controlling. He is constantly trying to overcome a lifelong disorder.

When you're young behavioral mishaps are more excusable. "He's just a kid," or "boys will be boys," are common responses. As a child, Jeremy's disorder was less noticeable. As he got older the disorder became more pronounced and unfortunately less acceptable; as society and the law tend to have different behavioral expectations of adults. Jeremy's disorder did not go away when he turned eighteen. ADD is a lifetime struggle for him.

I have watched and studied my brother over the years and my conclusion is that I would never want to live in his brain, even for a moment. I've watched my brother struggle to just sit down and work on his computer. I've noticed that he sits down and immediately finds his chair positioned uncomfortably so he has to fidget with it for a several moments. I've observed his impatience with his computer, his annoyance that he forgot his Sprite in the kitchen, and that the movie he wanted to watch is not coming in to focus properly. All the tiny nuisances and steps it takes to accomplish a task for him, which to the average onlooker appear simple enough, can be completely overwhelming to Jeremy. Everything moves at warp pace in his brain. I have only sensed his frustration, but have never personally experienced it, or fully empathized (mainly because I cannot).

Our family has always known that a great deal of Jeremy's behavior has been as a result of his disorder and we have always done our best to be supportive of him, and help him during his repeated struggles. We have watched him try and fail time and again. On the other hand we have

celebrated his achievements with great encouragement. We continue our support because he continues to need our support. This is still a lifelong process for Jeremy and all of us as a growing family.

Jeremy is an amazing brother. He is my ultimate protector. He has contributed to my growth as an individual and I attribute my career choices and my ability to succeed as a teacher to my brother. He has taught me the value of patience. He has taught me the importance of listening and understanding others, and he has taught me forgiveness because my brother needs these values from others in order for him to contribute to his family and society.

My brother is definitely capable of achieving success for himself and his own budding family. There are a lot of individuals with ADD and other types of disorders who fold their cards and choose to feel like victims. Jeremy has faced his challenges head on. He has gotten back up when he has fallen and he has gone after life with such vigor, it's truly an inspiration to others. He has a glow and a life force that attracts individuals to him, and those individuals have become better for knowing him.

Until recently, Jeremy was living with, and supporting Janice Wenk and her two children, Spencer and Abbey whose husband and father have effectively abandoned them.  I had the opportunity to visit my brother and watched how attentive he was with Janice and the kids. I noticed that Jeremy and Spencer have an affectionate guy code with one another. I saw the many shoes my brother bought for Abbey. I smiled the evening he ordered dinner for the family and paid the check with such pride.

It's unimaginable what these court proceedings have been like for Jeremy. He's become so accomplished in so many areas of his life, and once again his disorder is slighting him. Yes, he is impulsive and fast paced. Yes, he doesn't make the best decisions all the time. But, Jeremy Watnick is not a criminal. He truly does not have any proclivity towards criminal behavior in his entire being.

Jeremy is a thirty-two year old with ADD. He is also a team leader, an extremely important father figure to two young children, a supportive companion to Janice, and a loving and caring brother to me. He is an important and integral part of our entire support system.

This letter is a plea for compassion. This letter is a glimpse of ADD in a family setting in hopes you will acknowledge the impact this disorder has on Jeremy's life and our entire growing family. ADD is not an excuse for wrong behavior, but in some cases can lead to poor judgment.

When Jeremy appears before your court, please consider his many struggles and realize that he in no way intended to violate any law or instruction of the court. Jeremy is sincerely remorseful and would like to continue to devote his life to Janice and serve as a as role model for Spencer and Abbey rather than serving time.

Sincerely,

Dariele Watnick
Educator and Loving Sister

]

**REUBEN WATNICK**
**A SHEFFIELD 16 CENTURY VILLAGE**
**WEST PALM BEACH, FLORIDA 33417**

Honorable Sam Sparks,
US District Judge
Western District of Texas
Austin Division

Dear Honorable Sam Sparks,

My name is Reuben Watnick. I am 99 years old and Jeremy's grandfather. I write this on behalf of his grandmother Sophie Watnick and myself. I was a professional Civil Engineer. We of course have known our grandson his entire life. Jeremy has struggled with many difficult challenges including dealing with his ADD condition.

During the Second World War, I interrupted my career to work on the Manhattan Project in Oak Ridge Tennessee designing laboratories and buildings for scientists, military and staff in a race to beat Nazi Germany from producing the first atom bomb. For three years, I left my career to work on this most crucial of all projects to the United States and the saving of our soldier's lives. After the war, I was awarded a medal from the United States department of War for my efforts. I've been told my work helped save the lives of more than a half million American military personnel.

In 1988, Jeremy and his family were in a horrific auto collision north of Montreal Canada when a truck ran into their car. Jeremy's father and mother were nearly killed and badly injured. Only Jeremy was not badly hurt. Yet, 600 miles from home in a region where few people spoke English, Jeremy took charge and arranged for ambulances to transport his mother, father, and sister to The Royal Victoria Hospital in Montreal (90 miles to the South). A remarkable demonstration of responsibility. This is who Jeremy really is.

Jeremy has always been a caring grandson to his grandmother and me; visiting us, telephoning us regularly asking us about our health and our needs and telling us about his job and his responsibilities and complements he has received from company executives and customers for the exceptional work he has done.
.
We know Jeremy to be a good person; a hard worker, a person who wants to achieve something in life; considerate to his grandparents. We believe that what happened must have been an impulsive action and certainly not a pattern of conduct.

In consideration of my own contribution to our country's most important war effort his grandmother and I plead with your honor not to impose a sentence on Jeremy whereby he would be unable to support Janice and her children.

For our sakes please extend as much leniency and as brief a sentence as you are possibly able. Jeremy does not have criminal tendencies and we are confident he will never be back in court again.

Thank You.

Sincerely        Reuben Watnick

Reuben Watnick

400 East 85th Street
New York, New York 10028
December 2, 2006

The Honorable Sam Sparks
United States District Judge for the
Western District of Texas

Dear Judge Sparks,

For more than thirty years I owned and operated a small grocery store on the avenue where the Watnick family lived in NYC. Over the years I got to know the children very well. Jeremy  Watnick was definitely one of my favorites, as he had a very sweet  endearing way about him. In my store he was always polite, kind and helpful. Being the wise shopkeeper that I was, it was important that I always kept my eye out for theives. You could say that I had a real talent for uncovering dishonesty--whether among my employees or my customers (big, small, rich or poor). It is the one thing I never tolerated. Without any hesitation I can honestly say that Jeremy was never ever a thief. No matter what, he always waited his turn and showed me what he had...and if he was a little short...he would tell me, and.. if he promised to pay me back...he always did. It might sound funny, but even as a child...he had a triple A rating with me. That's just the kind of child he was...honest and decent.  When he got to be a teenager, he often came in, in the company of a group of friends , and I never had to "watch" them, 'cause as long as Jeremy was there, I knew nothing would ever be stolen. The qualities that I admire in all children and adults were firmly embedded in both the Watnick children--a sense of decency, a respect for others, a willingness to be helpful and above all, honesty.  I know Jeremy's actions in this case constituted a serious lapse in judgement ...for which he is extremely remorseful.
 I sincerely ask that every consideration be given to him in order that he may continue to lead a productive life,  pursue his career, and provide for his adopted family. Someone like Jeremy has alot to offer society. He has a heart of gold, a winning smile, and such a nice way about him. The fact that he has found someone to share his life with, that he is doing well in his career, and that, aside from this possible slip-up, he is behaving like a responsible goal oriented young adult has prompted me to write this letter on his behalf. If you can, would you please be as lenient as possible. He really is a very nice person with a bright future and it would just be tragic to see the positive steps he has taken to date lost because of this conviction. The horror and embarrassment of this whole situation has forced him to be very humble and contrite. A jail sentence would ruin all of the good progress he has made.
 Thank you for your consideration.

Sincerely,

*Susan Coleman*

SUSAN COLEMAN

*Michael Korda*
*194 Gretna Road*
*Pleasant Valley*
*New York 12569*

December 2, 2006

Hon. Sam Sparks
United States District Judge
        For the Western District of Texas

Dear Judge Sparks,

My name is Michael Korda, I am the former Editor in Chief and current Editor in Chief Emeritus of Simon & Schuster, the book publisher, and as a writer the author of such books as *Charmed Lives*, *Queenie*, *Country Matters*, *Horse People*, *Ulysses S. Grant* and *Journey to a Revolution*. I am a close friend of Jeremy Watnick's father, Jay S. Watnick—indeed he is one of my dearest friends, as well as a business associate whose advice, sagacity and judgment I have relied upon for many years. I have known Jeremy, and followed his progress through his father and mother for most of his life.

I also have a son, who has experienced some ups and downs, and I am happy to say that since he has become an adult he has led a successful, happy and productive life. I see no reason why, if given a second chance, the same will not be true of Jeremy. I know he has surely been challenged by his ADD, but he has overcome much of it. I know him to be a hard worker, diligent and responsible, who has worked in the office of one of the literary agencies I used to acquire books from, and they commented on how well he did the summer he worked for them, and how sorry they were to lose him. I have spoken to him myself, in the past, and have always been impressed by his energy and sense of purpose. I believe he would be an asset to any employer, and that his recent misfortune will doubtless focus his determination.

I know that Jeremy held down an important and responsible job, and got promotions and letters of congratulations from his employer—so much so that this was the reason he moved to Texas in the first place, along with Janice Wenk and her children.

I do firmly believe that Jeremy's intelligence and capacity for hard work will offer him many opportunities, and that it would be a loss for all concerned if he were not given a chance to put all this behind and make a life for him and his young family.

I respectfully urge you, Your Honor, to consider this as an unfortunate occurrence in his young life, and to be compassionate and understanding for Jeremy and those he loves and who love him. I believe that his chance for a promising and productive future is in your hands.

Thank you.

Sincerely,

# MARCY L. BLUM ASSOCIATES INC.

133 WEST 19TH STREET, 7TH FLOOR
NEW YORK, NEW YORK 10011
PHONE(212)929-9814 FAX(212)989-4070


December 7, 2006

The Honorable Sam Sparks
United States District Judge
For The Western District of Texas

   I am a party and special event coordinator with my own business in New York City for
the past eighteen years. I have co-written two books; Weddings for Dummies and
Wedding Planning for Dummies and am a contributing editor for the prestigious bridal
magazine, Modern Bride.
   I originally met Jeremy Watnick when his parents hired me to plan his Bar-Mitzvah in
1987. A few years later, they hired me to plan a Bat-Mitzvah for his sister Dariele and
consequently, my relationship with the Watnick family morphed from professional to
friendship and has remained so. Dariele Watnick worked for me for a few years after she
graduated college and for several years now, the Watnick's and I have been together at
many important occasions in each other's lives, both celebratory and sad.
   From day one, I was both fascinated by and fond of Jeremy. I realized there was a
depth of character to him that I hadn't encountered in many of the young people whose
celebrations I was producing. His enormous amount of caring and protectiveness for his
younger sister was a rarity for someone his age in itself-he was always very careful that
she wasn't left out by his friends and always was cognizant of whether or not she was
enjoying herself. Even more unusual, though, based on some of the bratty kids I had
worked with, was that while he was clearly challenged (due to learning disabilities) by
the work required of him for this event, he nevertheless realized it was of enormous
import to his parents and grandparents. He focused and worked and managed to learn
what was necessary to become Bar-Mitzvah'ed, pulling it off beautifully and with grace.
I was again impressed when, the family having had a horrific car accident while on
vacation in Canada, Jeremy pulled himself together (though he was only 14), made the
necessary phone calls, and selflessly took care of all the logistics that a much older
person would have been hard-pressed to navigate.
   To be completely honest, I think Jeremy touched a chord in me because he reminds me
of myself in many ways. I am currently fifty-one, but I am an "old hippie" having lived
on a commune in the early 1970's. I caused my parents years of grief in my teens and
twenties while I roamed around, attempting to "find" myself. But, and to me this is key, I
have always been a compassionate individual and inherently a decent person who,
because I had people who stood by me during those years, was able to eventually get
grounded and develop a successful career *and* a gratifying life.
   I hope this doesn't appear arrogant, as I am fully aware that I am neither a therapist nor
a lawyer and consequently have no credentials to analyze either Jeremy or the situation. I
can only say that I have watched this young man develop over many, many years. It has

been heartening to see that finally, in the last few years, with the help of people who love him and due to his inherent good character, he has evolved into a responsible adult looking at a future of both a successful, fulfilling career and a happy family life.  I respectfully ask that you exercise compassion and leniency so that he can continue to build both of those.

 Thank you so much for your time.


Sincerely,

Marcy Blum

# McIntosh and Otis, Inc.

353 Lexington Avenue, New York, New York 10016

Telephone:
212-687-7400

December 3, 2006

FAX:
212-687-6894

The Honorable Sam Sparks
United States District Judge for the
Western District of Texas

Dear Judge Sparks:

My name is Eugene H. Winick. I am a lawyer, admitted to practice and having practiced in New York State and Federal Courts. I am the CEO of McIntosh & Otis, Inc., a literary agency in New York City. I have known Jeremy Watnick since he was adopted as a newborn. His father and I met when we were in law school, and we served in the Air Force together. Our families have remained in contact ever since.

Jeremy worked for my literary agency during vacations while in school. I found him to be reliable, honest, and very helpful. He made a real contribution to our organization. He demonstrated mastery of some of the literary projects in which we were involved, and he got along well with everyone in the office. After knowing Jeremy all these years, I am confident that given the opportunity, he will be back on the right track and never again be involved in a situation similar to the one in which he is charged in your court.

I respectfully ask Your Honor to take an empathetic approach so that Jeremy's life is not ruined, and so that he can continue his emotional and financial support of his young family. His experience in your court system to date will have a profound effect upon him, causing him to fully recognize and be remorseful for his actions.

Thank you for any leniency you can show towards Jeremy.

Yours sincerely,

Eugene H. Winick

EHW:ih

## ALAN J. FRIEDMAN, MD, FACS
### Diplomat American Board of Ophthalmology
### Fellow American College of Surgeons

### CLINICAL ASSOCIATE PROFESSOR OF OPHTHALMOLOGY,
### NEW YORK UNIVERSITY MEDICAL CENTER

120 East 36th Street, New York, NY 10016

212 683-5180

Dec. 4, 2007

The Honorable Sam Sparks
United States District Judge for the
Western District of Texas

**RE**: JEREMY WATNICK

Dear Judge Sparks:

 I have had the privilege of knowing three generations of the Watnick family during the past 66 years. They are people of outstanding quality and integrity. Mr. Jay Watnick, Jeremy's father, has been one of my closest friends since we attended first grade, and our lives have intertwined over the past many decades.

I was at the birth and naming of their talented son, Jeremy, and have followed his growth to manhood. He has always demonstrated a strong commitment to excel, and has shown remarkable loyalty to his parents when emergencies arose. An outstanding example was his critical assistance to them when they were involved in a very serious accident in Canada. His dedication to their recovery while they were hospitalized in Montreal was exemplary.

Jeremy's most recent job was one of significant responsibility and his excellent performance led the company to offer him a promotion to a supervisory position in Austin, Texas. He has been supporting his female companion and her two children for which he has no legal obligation. Jeremy's father has told me of his son's misjudgment in Texas and knowing Jeremy's otherwise fine character, I am sure this was a very definite exception to his usual commendable conduct.

Therefore, I ask for your clemency in evaluating this case. Please allow Jeremy to continue to be a responsible credit to any company, and a reliable provider and caregiver to Janice and her children. I'm sure your consideration will be greatly appreciated and well rewarded by his future proper and acceptable behavior

Sincerely,

Alan J. Friedman,  M.D., F.A.C.S.